UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JASON P. BALLIS, ) | CASE NO. 5:17CV403 |
| ) | |
| Plaintiff, ) | JUDGE BENITA Y. PEARSON |
| ) | |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| NANCY A. BERRYHILL[1], ) | |
| ACTING COMMISSIONER OF SOCIAL ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, ) | OF MAGISTRATE JUDGE |
| ) | |
| Defendant. ) | |

Plaintiff Jason P. Ballis ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. In his brief on the merits, filed on June 20, 2017, Plaintiff asserts that the administrative law judge's ("ALJ") decision: (1) violated the treating physician rule; and (2) is not supported by substantial evidence. ECF Dkt. #14 at 17-24. Defendant filed a response brief on July 20, 2017. ECF Dkt. #15. Plaintiff filed a reply brief on July 31, 2017. ECF Dkt. #16.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB alleging disability beginning on February 17, 2012. ECF Dkt. #12 ("Tr.") at 219-10.[2] The application was denied initially and upon reconsideration. *Id.* at 153, 163. Plaintiff then requested a hearing, which was held on July 14, 2016. *Id.* at 37. On July 28, 2016, the ALJ issued a decision denying Plaintiff's claim. *Id.* at 16. Subsequently,

---

[1]On January 23, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed as a .PDF, rather that the page numbers assigned by the CM/ECF system. When the Transcript was filed the .PDF included an index, with the indexed pages differentiated from the numerical pages. Accordingly, the page number assigned in the .PDF mirrors the page number printed on each page of the Transcript, rather than the page number assigned when the Transcript was filed in the CM/ECF system.

the Appeals Council denied Plaintiff's request for review.  *Id.* at 1.  Accordingly, the July 28, 2016, decision issued by the ALJ stands as the final decision.

The instant suit was filed by Plaintiff on February 27, 2017.  ECF Dkt. #1.  On June 20, 2017, Plaintiff filed a brief on the merits.  ECF Dkt. #14 .  Defendant filed a response brief on July 20, 2017.  ECF Dkt. #15.  Plaintiff filed a reply brief on July 31, 2017.  ECF Dkt. #16.

## II.     RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.     Medical Evidence

In December 2011, Plaintiff complained of pain in his lower back and left knee that started four years prior, and rated the pain as 10/10.  Tr. at 477.  Plaintiff stated that he underwent a lumbar fusion when the pain began and that the procedure had worsened his pain.  *Id.* at 478.  On examination, Plaintiff displayed: upper extremity strength of 5/5 and lower extremity strength of 4/5; depressed reflexes; sensory depression at the L5 and S1 dermatones; and sensory depression encompassing some of the L4 dermatone.  *Id.* at 479.  Plaintiff was prescribed Percocet, Ibuprofen, and Tizanidine.  *Id.*

On February 21, 2012, Plaintiff reported for physical therapy and stated that the symptoms in his back and lower extremities had resolved for approximately six months after he underwent the lumbar fusion procedure.  Tr. at 321.  Continuing, Plaintiff indicated that he experienced constant pain in his lower back with intermittent episodes of severe pain in his lower extremities, and rated the pain as 8/10 to 10/10.  *Id.*  Plaintiff stated that he worked as a crane operator, but that he had not been attending work due to his back problems.  *Id.*  The physical therapist noted that Plaintiff had a normal gait and ambulated with no distress.  *Id.*  An aquatic therapy program was recommended.  *Id.*  On February 23, 2012, Plaintiff reported to Summit Pain Specialists and indicated that his pain had worsened since beginning aquatic therapy and that he was experiencing a burning sensation in his spine.  *Id.* at 475.  Plaintiff was discharged from physical therapy in April 2012 after failing to attend appointments or follow through with the course of his physical therapy.  *Id.* at 315.

In May 2012, Plaintiff was prescribed an abdominal binder brace.  Tr. at 451.  Plaintiff reported that his medication regimen was controlling his pain in July 2012, and that he was able

to maintain full-time employment. *Id.* at 466. In October 2012, Plaintiff reported to the emergency room after he fell and developed lower back pain with paresthesias shooting down his left leg. *Id.* at 563. On examination, Plaintiff displayed acute left sciatica and exacerbation of chronic back pain. *Id.* at 564. X-rays of Plaintiff's lumbosacral spine showed no acute fracture, and surgical screws that were in place and intact. *Id.* In November 2012, Plaintiff reported lower back pain that he rated as 10/10, and indicated that he experienced sharp pains in his legs that caused him to fall. *Id.* at 460. Plaintiff stated that his medication regimen continued to control his pain, but that he was "let go" from his job after being placed on light duty by his primary care physician. *Id.* Also in November 2012, Plaintiff stated that he experienced aching and throbbing lower back pain that was sharp at times and radiated down his right leg. *Id.* at 544. Plaintiff indicated that he could walk for ten to fifteen minutes before he had to stop and rest due to increased pain, and stated that his knees buckled occasionally due to pain and weakness. *Id.* It was noted that Plaintiff had developed "significant junctional degeneration at the level just above his previous fusion" that had progressed over the previous year. *Id.* at 549. Surgical decompression at L4-L5 was recommended. *Id.*

On February 15, 2013, Plaintiff was seen to discuss lumbar surgery, including microdecompression and removal of hardware. Tr. at 539. Plaintiff underwent surgical decompression at L4-L5 with removal of hardware at L5-S1 on March 19, 2013. *Id.* at 533. It was reported that Plaintiff was "well fused" at the L5-S1 level and that he was "well decompressed." *Id.* Plaintiff did well with post-surgical physical therapy, his pain was controlled, and he was discharged "improved from admitting condition" on March 22, 2013. *Id.* at 535.

On March 28, 2013, Plaintiff was seen by Leroy LeFever, D.O., for an appointment following his back surgery. Tr. at 358. It was determined that Plaintiff had been leaking spinal fluid. *Id.* Plaintiff reported that his leg pain was gone and that his overall pain was improving. *Id.* On May 21, 2013, Plaintiff returned to Dr. LeFever. *Id.* at 355. Straight leg raises and motor system testing were negative in both lower extremities. *Id.* at 356. On May 30, 2013, Plaintiff requested a release to return to work, however, the request was deferred to Plaintiff's

-3-

primary care physician since he was taking medication that could impair his ability to operate machinery at his job. *Id.* at 354. On June 3, 2013, Plaintiff indicated that: his former employer wanted to rehire him; he could climb laterally; he was not experiencing any lower extremity weakness or pain; and he was able to ride a bicycle. *Id.* at 352. Plaintiff was released to return to work. *Id.* at 353.

On June 20, 2013, Plaintiff reported worsening back pain after returning to work. Tr. at 351. Plaintiff continued to report worsening back pain in July 2013, adding that the pain radiated down his left leg and that he had been missing work due to the pain. *Id.* at 349. On examination, Plaintiff: was not in distress; displayed weakness of the lower left extremity with knee extension and flexion, plantar flexion, and dorsiflexion; decreased strength bilaterally; positive right straight leg tests; and pain in the left side at L5 that extended down the posterior side of the lower left extremity to the knee. *Id.* at 350. In September 2013, Plaintiff reported numbness in his back and constant back pain with walking, standing, or sitting. *Id.* at 343. Plaintiff also indicated that he recently started working part-time. *Id.*

On January 2, 2014, Plaintiff told Dr. LeFever that he had fallen on ice two days prior, noting some increased pain, but not severe pain. Tr. at 334. Dr. LeFever found: a severly reduced range of motion; sensory deficits in Plaintiff's left posterior thigh, gluteal region, and right lateral knee; and reduced strength in the lower extremities. *Id.* at 335. In February 2014, Plaintiff was seen after an emergency room visit resulting from a motor vehicle accident. *Id.* at 328. Plaintiff reported increased back pain following the accident and that he was experiencing chronic weakness in his left leg that had not increased. *Id.*

On March 7, 2014, an MRI of Plaintiff's lumbar spine showed: post-surgical changes with laminectomy at the L4 and L5-S1 levels; mild distortion and fatty infiltartion involving the posterior paraspinal musculature at the L5-S1 level; posterior annular bulge at L1-L2; bulge at L3-L4 compressing the thecal sac; mild bilateral facet arthrosis and retrolisthesis of L3; post-surgical laminectomy defects at L4-L5, diffuse annular bulging, posterior central/right central extrusion type herniation contacting the thecal sac and the right L5 nerve root, with both foramina being at least mildly stenotic due to the disc bulge and facet arthrosis; and post-surgical

laminectomies and discectomy with interbody devices at L5-S1, with residual pedicle screw tracts, posterolateral osseous fusion, and mild bilateral facet arthrosis, but no recurrent disc herniation or patent foramina. Tr. at 448. Post-contrast images revealed mild enhancing epidural fibrosis at L4-L5 anterolaterally and bilaterally, and scar tissue that contacted the thecal sac and the L5 nerve roots. *Id.*

Plaintiff reported worsening pain in his neck and severe pain in his mid- and lower-back that radiated down his right leg on March 21, 2014. Tr. at 482. It was noted that Plaintiff displayed: no swelling in the lower extremities; guarding and spasm of the cervical spine and mid-thoracic spine; severe spasms and tenderness in the lumbar spine with loss of lordosis; no gross abnormalities in the ankles or hips; the ability to mount and dismount the exam table without difficulty; the ability to perform heel to toe walking and walk without a cane or walker; and negative straight leg raise testing. *Id.* at 482-83. Plaintiff was prescribed a back brace and instructed to continue physical therapy. *Id.* at 483. Also on March 21, 2014, x-rays showed: a prosthetic disc with osseous fusion mass at L5-S1; laminectomy at L4-L5; lateral fusion mass at L5-S1; and that the pelvis was low on the right. *Id.* at 485.

Plaintiff complained of discomfort across his back and rated the pain 10/10 on March 31, 2014. Tr. at 488. On examination, Plaintiff: stood upright; was stiff on flexion, extension, and rotation; was able to toe and heel walk; and had normal strength bilaterally. *Id.* Medical imaging did not reveal any significant nerve root compression. *Id.* On April 9, 2014, Plaintiff went to the emergency room after a tow motor ran over his left foot while he was at work. *Id.* at 555. On examination, Plaintiff had full range of motion in his toe and there was no evidence of any crush injury or laceration. *Id.* at 555-56. Plaintiff was discharged home in satisfactory condition. *Id.* at 556. In April 2014, Plaintiff complained of lower back pain radiating into his right leg. *Id.* at 571. On examination, Plaintiff displayed normal deep tendon reflexes and normal bilateral lower extremity muscle strength. *Id.* In May 2014, Plaintiff reported that he was depressed as a result of the pain and that he was not able to work. *Id.* at 600. The following month, Plaintiff reported that his depression had been stable since his last visit and that he continued to experience back pain. *Id.* at 596. On July 9, 2014, Plaintiff continued to complain

of worsening back pain following the motor vehicle accident. Tr. at 610. Plaintiff reported that his symptoms were aggravated by daily activities, lying/resting, and sitting, and that he was having difficulty walking. *Id.* X-rays showed no instability on flexion or extension, and a CT scan revealed "good alignment and spacing" in the lumbar spine. *Id.* at 608. Plaintiff was referred for physical therapy and pain management. *Id.*

On August 10, 2014, Plaintiff's primary care physician, Timothy Neely, D.O., completed a questionnaire regarding Plaintiff's impairments. Tr. at 709-712. Dr. Neely opined that Plaintiff had: muscle weakness in both legs and decreased range of motion in the lower back; limited motion in the joints and spine, although these limitations were "not officially measured"; no significant restriction of daily activities; no impairment of interests, habits, or behavior; normal and symmetric motor abilities bilaterally; normal and symmetric knee and great toe extension bilaterally; and normal and symmetric hip flexion bilaterally. *Id.* At an appointment with Dr. Neely on September 17, 2014, Plaintiff reported good symptom control. *Id.* at 801.

In October 2014, Plaintiff underwent a consultative psychological evaluation with Gary J. Sipps, Ph.D., in connection with his application for benefits. Tr. at 714-18. Dr. Sipps noted that Plaintiff had not participated in psychological counseling and opined that Plaintiff: did not appear limited in his ability to understand spoken instructions, but might be limited in his ability to understand and remember written instructions; was not limited with regard to simple tasks or in the ability to respond appropriately to supervision and coworkers in a work setting; and was not limited in his ability to respond appropriately to work pressures. *Id.* at 717-18.

On November 6, 2014, Dr. Neely completed a second questionnaire regarding Plaintiff's limitations. Tr. at 799. Dr. Neely opined that Plaintiff could: work four hours in a workday; stand fifteen minutes at a time; stand for sixty minutes in a workday; sit for thirty minutes at a time; sit for two hours in a workday; lift ten pounds occasionally; and lift twenty pounds frequently. *Id.* On December 6, 2014, Dr. Neely completed an additional pain questionnaire, opining that Plaintiff's pain was frequently severe enough to interfere with his attention and concentration, and that Plaintiff was being truthful about his perception of pain. *Id.* at 800. Dr. Neely completed another questionnaire on January 19, 2015, stating that Plaintiff: had a long

-6-

history of lower back pain after multiple surgeries; had leg weakness, numbness, and chronic pain; was unable to stand for more than one hour and unable to sit for one hour without breaks; and was unable to lift heavy objects. *Id.* at 723-25.

On November 23, 2015, Plaintiff told Dr. Neely that he was working, but was still experiencing chronic back pain and some numbness in his left leg. Tr. at 787. Plaintiff presented to an emergency room on December 22, 2015, complaining of a sore throat. *Id.* at 765. A physical examination showed normal findings regarding Plaintiff's back, including normal range of motion and tenderness. *Id.* at 766. An examination of Plaintiff's upper and lower extremities resulted in normal findings, including a normal range of motion, normal motor strength, intact sensation, and no edema. *Id.* Plaintiff displayed normal speech and did not present with any focal motor or focal sensory deficits. *Id.*

On February 15, 2016, Plaintiff returned to the emergency room complaining of foot, ankle, and toe pain and swelling. Tr. at 775. Plaintiff stated that he was in the process of moving and had been walking up and down stairs frequently. *Id.* An examination of Plaintiff's back, upper extremities, and lower extremities showed normal results. *Id.* at 776. The neurological portion of the exam also resulted in normal findings. *Id.* It was noted that Plaintiff was able to walk with a steady gait when he arrived at the emergency room, and that he appeared uncomfortable. *Id.* at 778. Plaintiff was given a "postop shoe" for his "foot sprain due to his tall height of being 6ft 5in which puts pressure on his foot arch as well as excessive movement, going up and down steps." *Id.* at 776.

On March 1, 2016, Dr. Neely completed an "Off-Task/Absenteeism Questionnaire." Tr. at 762. Dr. Neely checked a box indicating that Plaintiff would likely be off-task at least twenty-percent of the time. *Id.* Continuing, Dr. Neely noted that Plaintiff had post-laminectomy syndrome and lumbar spondylosis. *Id.* Additionally, Dr. Neely checked a box indicating that Plaintiff would miss work more than four times per month. *Id.* Plaintiff saw Dr. Neely on May 16, 2016, for complaints of chronic lower back pain, and weakness in his legs and lower back. Tr. at 792. Continuing, Plaintiff stated that he had recently lost his job and car, and that he had started a new job. *Id.*

### B.      Hearing Testimony

The ALJ held a hearing on July 14, 2016, with Plaintiff, his attorney, and a vocational expert ("VE") present. Tr. at 38-39. On examination by the ALJ, Plaintiff testified that he held a driver's license and drove, but that he could not drive for over an hour without pulling over and taking a break. *Id.* at 44-45. Plaintiff stated that he had worked since his alleged disability onset date at "a lot of jobs," but that he had been let go from each job after his drug screens came back positive for his pain medications. *Id.* at 47. Continuing, Plaintiff indicated that since the alleged disability onset date he had: worked as a mixer for a few months; performed home restoration work for about a month; and delivered sandwiches for Jimmy John's for a few weeks, working an hour and a half a day. *Id.* at 49.

Next, Plaintiff testified that he was in a car accident in February 2014. Tr. at 52. Plaintiff stated that his back surgeries worsened his lower back pain. Tr. at 65-66. Continuing, Plaintiff indicated that he experienced symptoms in his right leg daily and that his back pain was constant. *Id.* at 66. Plaintiff testified that he had been taking pain medications since his first surgery in 2008, and that he had tried aquatic therapy but did not find it helpful. *Id.* When asked if anything helped ease his pain, Plaintiff stated that lying down in bed helped a little bit and that the pain medications took "the edge off a little bit," but that the pain was never gone. *Id.* at 67. Plaintiff also stated that he fell due to weakness in his legs and feet "just about every other day." *Id.* at 68-69. Regarding his right knee, Plaintiff indicated that six surgeries had been performed on that knee alone, and that it "always bothered" him. *Id.* at 69-70. Plaintiff continued, stating that he had trouble gripping items with his right hand and that the hand was "completely crooked." *Id.* at 70.

When asked about a typical day in his life, Plaintiff testified that he would wake up, take his medication, and then lie down on the couch and watch television with his children. Tr. at 70-71. Continuing, Plaintiff stated that he would take another pill for the pain around noon and then sit outside with his children for thirty to forty minutes before returning inside and reclining in a chair. *Id.* at 71. Plaintiff stated that he took a third pill around 6:00 P.M. or 6:30 P.M., ate dinner with his children, watched more television, and then took another pill before going to bed.

*Id.* When asked about his ability to walk, stand, and sit, Plaintiff testified that he could: walk for a block before needing a break; stand for fifteen to twenty minutes; and sit for thirty to thirty-five minutes. *Id.* Plaintiff stated that he could lift ten pounds safely and comfortably. *Id.* at 72. Continuing, Plaintiff indicated that he did not perform yard work, chores around the house, or grocery shopping. *Id.* Plaintiff stated that he did not read, use computers, or visit with friends and family other than going to the home of his fiancé's parents. *Id.* at 72-73.

Next, Plaintiff was examined by his attorney. Tr. at 73. When asked about side effects from his medications, Plaintiff testified that his medications made him sluggish. *Id.* at 73. Plaintiff stated that he could only sleep and hour or two before waking due to the pain and that he napped throughout the day in hour-long increments. *Id.* at 74. Continuing, Plaintiff stated that there were complications during one of his surgeries that resulted in leaking spinal fluid and required an additional surgery to correct, and that this was why he was afraid to undergo any additional procedures. *Id.* at 78-79. Plaintiff also testified that he had a limited education, and that he had trouble reading and writing. *Id.* at 81.

The ALJ then examined the VE. Tr. at 83. First, the ALJ presented the VE with several hypothetical individuals and asked whether there was work in the national economy that each individual could perform. *Id.* at 88. Regarding the hypothetical individual with the residual functional capacity ("RFC") later adopted by the ALJ in the decision, the VE testified that such an individual could not perform Plaintiff's past work, but could perform work as a marker, mail clerk, and/or office helper. The ALJ then added the limitation that the hypothetical individual could perform sedentary work and the VE expert testified that such an individual could perform work as a charge-account clerk, food and beverage order clerk, and document comparer. *Id.* at 89-90. Next, the ALJ added the limitation that the hypothetical individual would require the ability to sit or stand without being off-task. *Id.* at 90. The VE testified that this hypothetical individual could perform both the light and sedentary jobs previously offered. *Id.* at 91. Continuing, the VE stated that once the hypothetical individual would be off-task fifteen percent of the workday or absent more than one day per month there would be no available jobs. *Id.* at

91.  Additionally, the VE stated that there would be no jobs available for an individual that would require two or more fifteen-minute breaks beyond any regular breaks.  *Id.* at 92.

### III.  RELEVANT PORTIONS OF THE ALJ'S DECISION

On July 28, 2016, the ALJ issued the decision denying Plaintiff's application for DIB.  Tr. at 16.  The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2019.  *Id.* at 21.  Continuing, the ALJ indicated that Plaintiff engaged in substantial gainful activity during 2012 and 2013, but that there had been continuous twelve-month periods during which Plaintiff did not engage in substantial gainful activity.  *Id.*  The ALJ then stated that the remaining findings in the decision addressed the period beginning January 1, 2014, during which Plaintiff did not engage in substantial gainful activity.  *Id.*  Next, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine status post three spinal surgeries; lumbar disc herniation; lumbosacral spondylosis; post laminectomy syndrome; and adjustment disorder with depressed mood.  *Id.* at 22.  The ALJ stated that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*

After consideration of the record, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following limitations: stand and/or walk (with normal breaks) for a total of four hours in an eight hour workday; occasionally push/pull with the bilateral lower extremities; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and crouch; never kneel or crawl; must avoid concentrated exposure to vibration, moving mechanical parts, and unprotected heights; can perform simple, routine, and repetitive tasks with few changes in a routine work setting; and the ability to sit or stand at will without being off task.  Tr. at 23.

After making the RFC finding, the ALJ stated that Plaintiff was unable to perform any past relevant work, was a younger individual on the alleged disability onset date, had a limited education, and could communicate in English.  Tr. at 29.  The ALJ next indicated that the transferability of job skills was not material to the determination of disability because the

Medical-Vocational Rules supported a finding that Plaintiff is not disabled. *Id.* Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* Based on the above, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from February 17, 2012, through the date of the decision. *Id.* at 30.

## IV.   STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g).

Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937(citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## **VI.    LAW AND ANALYSIS**

### **A.    Treating Physician Rule**

Plaintiff first asserts that the ALJ improperly addressed the medical opinions of his treating physician, Dr. Neely, thereby violating the treating physician rule. ECF Dkt. #14 at 18. An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he or she must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the

-12-

reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 551 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, 413 Fed.Appx. 856, 864 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

Plaintiff claims that the ALJ: (1) failed to properly address the opinion of Dr. Neely submitted on November 8, 2014; and (2) did not provide "good reasons" for assigning little weight to the opinion of Dr. Neely submitted on March 1, 2016, stating that Plaintiff would be

-13-

off-task twenty percent of the workday. ECF Dkt. #14 at 18-21.  Continuing, Plaintiff states that the ALJ conflated two opinions of Dr. Neely, specifically, the opinions issued on November 8, 2014, and December 6, 2014. *Id.* at 20 (citing Tr. at 799-800).  Plaintiff claims that the ALJ only addressed the portions of these opinions indicating his ability to work four hours per day and that he would be absent three times per month. *Id.*  Regarding these opinions, Plaintiff avers that the ALJ did not address Dr. Neely's opinion that he was limited to: standing fifteen minutes at time for a total of sixty minutes in a workday; sitting for thirty minutes at a time for a total of two hours in a workday; lifting ten pounds occasionally and twenty pounds frequently; occasionally bending, balancing, working around dangerous equipment, operating motor vehicles, tolerating cold, and tolerating heights; never stooping; constantly using hands and arms; and constantly tolerating heat, dust, smoke, fumes, or noise. *Id.*  According to Plaintiff, the ALJ never addressed the majority of Dr. Neely's opinion and "never assigned a specific weight to this opinion in violation of the treating physician rule." *Id.* (citing *Blakely,* 581 F.3d at 408).

Continuing, Plaintiff asserts that the ALJ never addressed Dr. Neely's opinion that he would likely be off-task at least twenty percent of workday.  ECF Dkt. #14 at 21.  Plaintiff recognizes that the ALJ is not required to discuss every piece of evidence in the record or include every limitation in the RFC finding, however, according to Plaintiff the off-task limitation was relevant to the ALJ's RFC finding. *Id.* (citing *Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir. 2004)).

Defendant contends that the ALJ did discuss the opinion of Dr. Neely issued on November 8, 2014, although the ALJ misdated the opinion.  ECF Dkt. #15 at 13-14.  Next, Defendant asserts that the ALJ's decision makes clear that Dr. Neely' opinions were assigned less than controlling weight because of the extreme limitations contained therein that were inconsistent with the evidence of record. *Id.* at 14.  Defendant notes that the ALJ considered that: Plaintiff's pain was controlled with medications as recently as August 2015; and during Plaintiff's 2016 trip to the emergency room he reported that he was in the process of moving and was walking up and down steps frequently when he developed right foot pain, that an examination of his back and lower extremities was normal at this time, and that his gait was

-14-

steady and there were no signs of swelling or infection. *Id.* (citing Tr. at 27, 29, 752, 775-79). After citing these portions fo the ALJ's decision, Defendant states that the ALJ determined that the evidence was inconsistent with Dr. Neely's assessments of extreme physical limitations, and this was the reason for discounting the opinions. *Id.* at 15.  Additionally, Defendant asserts that the ALJ adequately communicated that Dr. Neely's opinion that Plaintiff would be off-task twenty percent of the workday was discounted. *Id.* at 15-16.

Plaintiff's argument is without merit.  While it does appear that the ALJ conflated the opinions of Dr. Neely issued on November 8, 2014, and December 6, 2014, a review of the decision shows that the ALJ considered the limitations addressed in both opinions. *See* Tr. at 27, 799-800.  The ALJ accurately details the limitations assessed in both opinions in the decision when discussing Plaintiff's treatment with Dr. Neely and the opinions issued regarding such treatment, indicating that the limitations assessed in both opinions were taken into consideration. *See id.*  The ALJ provided a detailed analysis of Plaintiff's treatment with Dr. Neely and then stated:

> Dr. Neely completed a pain questionnaire on December 6, 2014, in which he opined [Plaintiff] could work 4 hours per day and would be absent three times per months. [sic] However, he did not support his conclusion with evidence that [Plaintiff] could only work 4 hours.  While [Plaintiff] reported losing jobs due to his back, the work he performed was often preclusive to his limitations, which Dr. Neely did not consider.

Tr. at 26-29.

The ALJ took issue with Dr. Neely's opinion that Plaintiff could only work four hours per day and would be absent three times per month, stating that these conclusion were not supported by evidence.  Tr. at 29.  Dr. Neely's opinion issued on November 8, 2014, which was considered in conjunction with the opinion issued on December 6, 2014, did not indicate the basis for such extreme limitations as Dr. Neely only circled "4hrs" when asked "[h]ours patient can work per day," and checked the box indicating the Plaintiff would be absent from work more than three days per month. *See id.* at 799.  These extreme limitations are not supported by Dr. Neely's treatment notes, and Plaintiff does not cite to any medical evidence supporting such limitations. *See* ECF Dkt. #14 at 18-21.  Plaintiff carries the burden of showing that he is

-15-

disabled. *Moon*, 923 F.2d at 1181. Here, Plaintiff fails to provide or cite evidence indicating that he was as limited as opined by Dr. Neely. Accordingly, the ALJ properly discounted these portions of Dr. Neely's opinions.[3]

Insofar as Plaintiff asserts that the ALJ did not address the majority of Dr. Neely's opinions issued on November 8, 2014, and December 6, 2014, the ALJ was not required to specifically address every limitation to which Dr. Neely offered an opinion. *See Thacker,* 99 Fed.Appx. at 664-65. The ALJ properly determined that Dr. Neely's opinions were not consistent with the medical evidence of record. For example, in discussing Plaintiff's treatment with Dr. Neely the ALJ stated:

> Despite limitations assessed by Dr. Neely [in a medical evaluation performed on January 19, 2015], [Plaintiff] reported his back pain was controlled with medication during an office visit on August 24, 2015, and his reflux improved as well...
>
> Despite [Plaintiff's] history of surgery and ongoing back pain, during an emergency room visit on February 15, 2016, [Plaintiff] reported he was in the process of moving and was walking up and down steps frequently when he developed right sided foot pain. Examination of his back was normal and range of motion to his upper and lower extremities was normal. His gait was steady and there were no signs of swelling or infection. An x-ray of his right foot was negative and he was given a postop shoe and instructed to follow-up with podiatry.

Tr. at 27. The ALJ determined that Dr. Neely's opinions were not consistent with the medical evidence, supported this conclusion with citations to the record, and was not required to specifically address every item considered in the opinions. *Id.* at 26-29.

Additionally, Plaintiff asserts that the ALJ did not consider the opinion of Dr. Neely issued on March 1, 2016, in the form of an "Off-Task/Absenteeism Questionnaire," on which he

---

[3]Plaintiff also claims that the ALJ erred by not assigning a specific weight to these opinions submitted by Dr. Neely because the ALJ did not explicitly state the level of weight assigned. ECF Dkt. #14 at 20. When read as a whole, it is apparent from the decision that the ALJ assigned less than controlling weight to these opinions. *See* Tr. at 28-29. The ALJ began his discussion of the opinion evidence by explaining that controlling weight may not be given to a treating source's opinion if it is not supported by evidence. *Id.* at 28. Following this explanation, the ALJ stated that these opinions from Dr. Neely were not supported by evidence. *Id.* at 29. Remand for the ALJ to explicitly state that these opinions were discounted is not necessary as the ALJ's decision makes clear that the opinions were discounted since they were not supported by the evidence of record.

checked a box indicating that Plaintiff would "be off-task at least 20% of the time." ECF Dkt. #14 at 21 (citing Tr. at 762). The ALJ did address a different portion of this opinion, stating:

> I give little weight to Dr. Neely's off task questionnaire in which he opined [Plaintiff] would be absent from work more than four times per month. This is speculation without a basis for the amount of absenteeism he asserts.

Tr. at 29. While the ALJ did not specifically address the portion of this opinion consisting of a checked box indicating that Plaintiff would be off-task twenty percent of the workday, as discussed above, the ALJ was not required to specifically address every item considered in each opinion. Further, prior to assigning little weight to this opinion, the ALJ cited and summarized the opinion. Tr. at 28. Accordingly, the ALJ was aware of Dr. Neely's opinion that Plaintiff would be off-task twenty percent of the time when he assigned little weight to the opinion submitted on March 1, 2016. For these reasons, Plaintiff has failed to show that the ALJ violated the treating physician rule.

### B. Listing 1.04

Plaintiff also claims that the ALJ's finding that his back impairment did not meet or medically equal the requirements of Listing 1.04A is not supported by substantial evidence. ECF Dkt. #14 at 21-24. Specifically, Plaintiff asserts that a review of the record supports a finding that he met the requirements of Listing 1.04A as of May 20, 2014, when he began exhibiting positive straight-leg raise tests on examination on a regular and continuing basis. *Id.* at 22. Plaintiff continues, contending that the record raises a "substantial question" over whether he meets Listing 1.04A. *Id.* at 23.

Defendant asserts that the ALJ properly determined that Plaintiff did not meet or medically equal the requirements of Listing 1.04A. ECF Dkt. #15 at 8-12. Specifically, Defendant states that to meet Listing 1.04A, Plaintiff was required to show evidence of motor loss, defined as atrophy with associated muscle weakness, accompanied by sensory or reflex loss. *Id.* at 9. According to Defendant, there is no report of atrophy in the medical record including the type of detailed circumferential measurements necessary to demonstrate significant motor loss as required to meet Listing 1.04A. *Id.*

Plaintiff's argument is without merit. Listing 1.04A requires:

-17-

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00E(1) states, in relevant part:

> However, a report of atrophy is not acceptable as evidence of significant motor loss without circumferential measurements of both thighs and lower legs, or both upper and lower arms, as appropriate, at a stated point above and below the knee or elbow pain given in inches or centimeters.

Plaintiff has not shown that there is any medical evidence showing atrophy with the type of circumferential measurements necessary to demonstrate significant motor loss and meet the requirements of Listing 1.04A. The lack of circumferential measurements is recognized by Plaintiff, who contends that the record "still raises a 'substantial question' over whether [his] back impairments meet or medically equal Listing 1.04A as ongoing motor loss accompanied with sensory reflex deficits are repeatedly noted." ECF Dkt. #16 at 3.

> The Sixth Circuit has explained:
>
> The relevant regulations require the ALJ to find a claimant disabled if he meets a listing. Yet they do not require the ALJ to address every listing - and with ample reason. There are a hundred or so listings. In the normal course, as a result, the ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ. If, however, the record "raises a substantial question as to whether the claimant could qualify as disabled" under a listing, the ALJ should discuss the listing.

*Sheeks v. Comm'r of Soc. Sec.*, 544 Fed.Appx. 639, 641 (6th Cir. 2013) (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)). The ALJ is not required to spell out every consideration that went into the step three determination. *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411 (6th Cir. 2006).

In the instant case, the ALJ indicated that he considered Listing 1.04. Accordingly, the ALJ agreed with Plaintiff that there was a "substantial question" as to whether Plaintiff met Listing 1.04A, considered the Listing, and then determined that Plaintiff did not meet the requirements of the Listing. *See* Tr. at 22. The ALJ was not required to explicitly spell out every consideration that went into his determination regarding the applicability of Listing 1.04A. Moreover, Plaintiff has failed to cite evidence supporting the conclusion that he meets all the

criteria of Listing 1.04A, namely, evidence showing atrophy with associated muscle weakness or muscle weakness that is supported by circumferential measurements. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00E(1). Accordingly, the ALJ's decision determining that Plaintiff did not meet Listing 1.04A is supported by substantial evidence.

## **VII.  CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.


Date: February 26, 2018        */s/George J. Limbert*
                               GEORGE J. LIMBERT
                               UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).